IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
JAMES BONINI
CLERK

2012 AUG 22 PM 2: 26

U.S. DISTRICT COURT
SOUTHERN DISTRICT OHIO
EAST DIV. COLUMBUS

JUDGE WATSON

MAGISTRATE JUDGE ABEL

**RICHARD HORTON**
#517-079
P. O. Box 300
11271 State Route 762
Orient, Ohio 43146

**Petitioner,**

VS.

**RHONDA RICHARD**

Warden, Corrections Reception Center
P. O. Box 300
11271 State Route 762
Orient, Ohio 43146

**Respondent.**

Case No.:

**EVIDENTIARY HEARING REQUESTED**

**DISCOVERY REQUESTED**

## PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### I.    PARTIES TO THE LITIGATION

1.    Petitioner, Richard Horton, is currently serving a *twenty-three* year sentence at the

Correctional Reception Center in Orient, Ohio.

2.    Respondent, Rhonda Richard is the warden of the Correctional Reception Center.

The warden is represented in these proceedings by the Attorney

General, Michael Dewine, 30 E. Broad Street, 17th Floor Columbus, OH 43215-

3428.

## II. PETITIONER IS BEING HELD IN CUSTODY

3. Petitioner is being held in custody by the State of Ohio at the Correctional Reception Center, where the Respondent is the warden.

## III. JURISDICTION

4. The United States District Court has jurisdiction over this petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2254 and 1331. Petitioner is in custody pursuant to judgment of an Ohio state court, and seeks relief on the ground that his imprisonment and sentence are in violation of his rights under the United States Constitution.

## IV. VENUE

5. Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division because Petitioner's conviction was obtained in the Franklin County Common Pleas Court in Columbus, Ohio. *See 28 U.S.C. § 2241(d)*.

## IV. PROCEDURAL HISTORY OF THE CASE

a. *Trial*

6. Petitioner was indicted by the Franklin County Grand Jury for eleven counts. The indictment alleged:

    Count one:    Aggravated burglary, a felony of the first degree in violation of R.C. 2911.11.

            a.    A specification to this count alleged that during the commission of this offense the Petitioner displayed or brandished a firearm

Count Two:    Aggravated robbery, a felony of the first degree, in violation of
R.C. 2911.01

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Three:  Robbery, a felony of the second degree, in violation of R.C.
2911.02

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Four:   Robbery, a felony of the third degree, in violation of R.C.2911.02

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Five:   Kidnapping, a felony of the first degree, in violation of
R.C.2905.01

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Six:    Felonious assault, a felony of the first degree, in violation of
R.C. 2903.11

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Seven:  Aggravated Robbery, a felony of the first degree, in violation of
R.C.2911.01

      a.    A specification to this count alleged that during the commission of
this offense the Petitioner displayed or brandished a firearm

Count Eight:  Robbery, a felony of the second degree, in violation of
R.C.2911.02

-3-

      a.     A specification to this count alleged that during the commission of this offense the Petitioner displayed or brandished a firearm

Count Nine:   Robbery, a felony of the third degree, in violation of R.C.2911.02

      a.     A specification to this count alleged that during the commission of this offense the Petitioner displayed or brandished a firearm

Count Ten:   Kidnapping, a felony of the first degree, in violation of R.C.2905.01

      a.     A specification to this count alleged that during the commission of this offense the Petitioner displayed or brandished a firearm

Count Eleven: Weapons under disability, a felony of the third degree, in violation of R.C. 2923.13

      a.     A specification to this count alleged that during the commission of this offense the Petitioner displayed or brandished a firearm

7.    Petitioner was represented by Myron Schwartz and Alisa Hofinger during the trial of this matter

8.    On February 3, 2006 Petitioner was found guilty by a jury of Count one, aggravated burglary; Counts two and seven, aggravated robbery; counts five and ten, kidnapping, felonious assault.

9    On February 3, 2006 Petitioner was further found guilty of having a weapon while under disability by the judge.

10.   Petitioner was sentenced by Franklin County Common Pleas Judge John Bender to an aggregate sentence of twenty-three years.

11.   Petitioner filed a timely notice of appeal in this matter.

b.    *DIRECT APPEAL TO THE TENTH DISTRICT COURT OF APPEALS*

12.    Petitioner was represented by Attorney Carol Wright in his direct appeal to the

Tenth District Court of Appeals.

13.    Petitioner raised the following assignments of error:

ASSIGNMENT OF ERROR NO. I:

THE REPRESENTATION PROVIDED TO RICHARD HORTON FELL FAR
BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL
CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN
VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AS WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO
CONSTITUTION.

ASSIGNMENT OF ERROR NO. II:

THE ADMISSION OF DETECTIVE WALKER'S TESTIMONY REGARDING
THE PHOTO ARRAY EVIDENCE PROCEDURE AND THE VICTIM'S
STATEMENTS IN REGARDS TO THE PHOTO ARRAY PROCEDURE
VIOLATED RICHARD HORTON'S RIGHT TO DUE PROCESS, A FAIR
TRIAL, AND THE EFFECTIVE ASSISTANCE OF COUNSEL AS
GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
ARTICLE I, §§ 2, 10 & 16 OF THE OHIO CONSTITUTION. ITS ADMISSION
ALSO VIOLATED THE OHIO EVIDENCE RULES. EVIDENCE RULES. [sic.]

ASSIGNMENT OF ERROR NO. III:

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE PHOTO
ARRAY EVIDENCE BECAUSE IT WAS AN IMPERMISSIBLY
SUGGESTIVE IDENTIFICATION THAT LACKED SUFFICIENT INDICIA
OF RELIABILITY THEREBY VIOLATING RICHARD HORTON'S RIGHTS
AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I,
§ 2, 10, AND 16 OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR NO. IV:

A TRIAL COURT MAY NOT SENTENCE A DEFENDANT TO NON-
MINIMUM AND CONSECUTIVE SENTENCES WITHOUT VIOLATING A
DEFENDANT'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I, § 10 AND 16 OF THE

-5-

OHIO CONSTITUTION. THE DECISION RENDERED BY THE SUPREME COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, IS INCOMPATIBLE WITH THE CONTROLLING PRECEDENT OF THE UNITED STATES SUPREME COURT AND MUST BE REJECTED.

ASSIGNMENT OF ERROR NO. V:

THE TRIAL COURT VIOLATED HORTON'S RIGHTS UNDER THE EX POST FACTO CLAUSE OF THE FEDERAL CONSTITUTION BY SENTENCING APPELLANT TO A TERM OF INCARCERATION WHICH EXCEEDED THE MAXIMUM PENALTY AVAILABLE UNDER THE STATUTORY FRAMEWORK AT THE TIME OF THE OFFENSE. THE DECISION RENDERED BY THE SUPREME COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, WHICH PURPORTS TO AUTHORIZE THE SENTENCE RENDERED AGAINST RICHARD HORTON, IS INCOMPATIBLE WITH THE CONTROLLING PRECEDENT OF THE UNITED STATES SUPREME COURT AND MUST BE REJECTED.

ASSIGNMENT OF ERROR NO. VI:

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE FEDERAL CONSTITUTION BY SENTENCING APPELLANT PURSUANT TO THE DECISION RENDERED BY THE SUPREME COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, BECAUSE THE HOLDING OF *FOSTER* IS INVALID UNDER *ROGERS V. TENNESSEE* (2001), 532 U.S. 451.

ASSIGNMENT OF ERROR NO. VII:

THE RULE OF LENITY REQUIRES THE IMPOSITION OF MINIMUM AND CONCURRENT SENTENCES, AND THE RULING OF THE TRIAL COURT TO THE CONTRARY MUST BE REVERSED.

14. The Tenth District Court of Appeals affirmed the trial court's decision on August 23, 2007.

C. *DIRECT APPEAL TO THE OHIO SUPREME COURT*

15. Petitioner was represented by David Stebbins in his direct appeal to the Ohio Supreme Court.

16. On September 19, 2007, Petitioner filed a notice of appeal and memorandum in support of jurisdiction. Petitioner raised the following assignments of error:

ASSIGNMENT OF ERROR NO. I:

THE REPRESENTATION PROVIDED TO RICHARD HORTON FELL FAR
BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL
CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN
VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS AS WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO
CONSTITUTION.

ASSIGNMENT OF ERROR NO. II:

THE ADMISSION OF DETECTIVE WALKER'S TESTIMONY REGARDING
THE PHOTO ARRAY EVIDENCE PROCEDURE AND THE VICTIM'S
STATEMENTS IN REGARDS TO THE PHOTO ARRAY PROCEDURE
VIOLATED RICHARD HORTON'S RIGHT TO DUE PROCESS, A FAIR
TRIAL, AND THE EFFECTIVE ASSISTANCE OF COUNSEL AS
GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
ARTICLE I, §§ 2, 10 & 16 OF THE OHIO CONSTITUTION. ITS ADMISSION
ALSO VIOLATED THE OHIO EVIDENCE RULES. EVIDENCE RULES. [sic.]

ASSIGNMENT OF ERROR NO. III:

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE PHOTO
ARRAY EVIDENCE BECAUSE IT WAS AN IMPERMISSIBLY
SUGGESTIVE IDENTIFICATION THAT LACKED SUFFICIENT INDICIA
OF RELIABILITY THEREBY VIOLATING RICHARD HORTON'S RIGHTS
AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I,
§ 2, 10, AND 16 OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR NO. IV:

A TRIAL COURT MAY NOT SENTENCE A DEFENDANT TO NON-
MINIMUM AND CONSECUTIVE SENTENCES WITHOUT VIOLATING A
DEFENDANT'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE I, § 10 AND 16 OF THE
OHIO CONSTITUTION. THE DECISION RENDERED BY THE SUPREME
COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, IS
INCOMPATIBLE WITH THE CONTROLLING PRECEDENT OF THE
UNITED STATES SUPREME COURT AND MUST BE REJECTED.

ASSIGNMENT OF ERROR NO. V:

THE TRIAL COURT VIOLATED HORTON'S RIGHTS UNDER THE EX POST FACTO CLAUSE OF THE FEDERAL CONSTITUTION BY SENTENCING APPELLANT TO A TERM OF INCARCERATION WHICH EXCEEDED THE MAXIMUM PENALTY AVAILABLE UNDER THE STATUTORY FRAMEWORK AT THE TIME OF THE OFFENSE. THE DECISION RENDERED BY THE SUPREME COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, WHICH PURPORTS TO AUTHORIZE THE SENTENCE RENDERED AGAINST RICHARD HORTON, IS INCOMPATIBLE WITH THE CONTROLLING PRECEDENT OF THE UNITED STATES SUPREME COURT AND MUST BE REJECTED.

ASSIGNMENT OF ERROR NO. VI:

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE FEDERAL CONSTITUTION BY SENTENCING APPELLANT PURSUANT TO THE DECISION RENDERED BY THE SUPREME COURT OF OHIO IN *STATE V. FOSTER* (2006), 109 OHIO ST.3D 1, BECAUSE THE HOLDING OF *FOSTER* IS INVALID UNDER *ROGERS V. TENNESSEE* (2001), 532 U.S. 451.

ASSIGNMENT OF ERROR NO. VII:

THE RULE OF LENITY REQUIRES THE IMPOSITION OF MINIMUM AND CONCURRENT SENTENCES, AND THE RULING OF THE TRIAL COURT TO THE CONTRARY MUST BE REVERSED.

17.   On December 26, 2007, the Ohio Supreme Court declined jurisdiction and

      dismissed the matter.   No review was sought in the United States Supreme Court.

d.    *COLLATERAL, POST CONVICTION RELIEF SOUGHT - COMMON PLEAS*

18.   On January 2, 2007 Petitioner filed a petition pursuant to R.C. 2953.21 in the

      Franklin County Court of Common Pleas.

19.   Petitioner alleged that trial counsel was ineffective for failing to call an expert on

      the unreliability of eyewitness identification; failing to call witnesses to testify

      to petitioner's character for non-violence; failing to object to the admission of the

      photo array, photo array forms and hearsay testimony of the case detective; and

      failing to produce impeachment evidence of Richard McClanahan.

20.     On February 2, 2007, the state responded. An evidentiary hearing was held on
        September 25, 2008.  Evidence was presented by Doctor John Tilley regarding the
        psychology of eyewitness testimony.

21.     On April 16, 2010, Judge Bender denied the petition for post conviction relief.

22.     Petitioner timely appealed this judgment.

e.      *COLLATERAL, POST CONVICTION RELIEF SOUGHT-TENTH DISTRICT*

23.     Petitioner was represented by David Thomas in his appeal of the trial court's
        denial of the post conviction petition.

24.     Petitioner raised a single assignment of error:

        The trial court erred in dismissing Appellant's petition for post conviction relief,
        where Appellant established that his trial counsel's failure to present expert
        testimony on the subject of eyewitness identification deprived him of his rights to
        a fair trial, the effective assistance of counsel, and due process of law as
        guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States
        Constitution and comparable provisions of the Ohio Constitution.

25.     On March 24, 2011, the Tenth District Court of Appeals affirmed the trial court's
        decision.

f.      *COLLATERAL, POST CONVICTION RELIEF SOUGHT – OHIO SUPREME
        COURT*

26.     On May 9, 2011, Petitioner filed a notice of appeal and memorandum in support
        of jurisdiction with the Ohio Supreme Court.

27.     Petitioner raised the following assignment of error:

                A trial court errs in dismissing petition for post-conviction relief, where
                testimony establishes that trial counsel's failure to present expert testimony
                on the subject of eyewitness identification deprived Appellant of his rights
                to a fair trial, the effective assistance of counsel, and due process of law as

guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United

States Constitution and comparable provisions of the Ohio Constitution.

28. On August 24, 2011, the Ohio Supreme Court declined jurisdiction in this matter.

29. No other motions have been filed in state or federal court other than the litigation

previously mentioned on behalf of the petitioner. No claims are pending in state

or federal court in regards to the conviction of the Franklin County Common

Pleas Court. Petitioner does not contemplate filing any petition or motion

attacking the conviction in the future. Petitioner, of course, reserves the right to

do so in either state court or federal court.

V. **STATEMENT OF THE FACTS**

30. On the afternoon of October 8, 2004, Richard McClanahan cashed a paycheck and

went to buy some beer at Bob's Market in Columbus, Ohio. He also had to use the

public telephone. Mr. McClanahan claimed that the Petitioner requested a loan

of twenty dollars. McClanahan refused. Petitioner also allegedly requested

permission to use the phone first before McClanahan. McClanahan refused.

31. McClanahan claimed that Petitioner was wearing a gray hooded sweatshirt and

jeans. At the time this incident supposedly occurred, Petitioner was with his wife,

Jeanette in Grove City, Ohio.

32 On October 9, 2004, someone knocked on the door of Richard McClanahan and

Rhonda Curry's residence. At the time this incident occurred, Petitioner was with

his wife Jeanette in Grove City, Ohio. Both Richard McClanahan and Rhonda

Curry were laying in a fold out bed a foot and a half from the front door.

33. After hearing a knock on the door, Richard McClanahan went to open the door

and a light-skinned African American intruder pushed past him. The intruder

came into the home and struck Richard McClanahan over the head with a silver

nine millimeter firearm. Richard McClanahan fell backward onto a pull-out mattress and pushed himself back towards the head of the bed. The intruder kept asking Mr. McClanahan for money, and eventually he fired a shot into Mr. McClanahan's leg.

34.    Mr. McClanahan could not remember where he put the money according to his trial testimony. There was forty dollars in his boots which he gave to the intruder. At the time of the alleged home invasion, Petitioner had fourteen hundred dollars in his checking account at Telhio Credit Union.

35.    Rhonda Curry was on the pull-out mattress as this was occurring. She stated that she went into shock and was focused on the gun as this was going on. The intruder rolled up the bed on Ms. Curry and held a gun to her demanding that she comply. She did. During this entire time Ms. Curry does not remember the gun going off and hitting Mr. McClanahan.

35.    The intruder left the home with forty dollars in cash. Neither Rhonda Curry nor Richard McClanahan saw the intruder's face; they claim they did however see his eyes.

32.    Rhonda Curry drove to Richard McClanahan's sister's home to phone an ambulance. The ambulance then took Richard McClanahan to Grant Hospital.

33.    Detectives interviewed Rhonda Curry the morning of the attack. She did not mention Richard Horton. She did not mention any Richard at all.

34.    At the crime scene, crime scene investigators recovered a casing, took photographs, and processed four latent fingerprints from the pull-out bed. These prints did not belong to Petitioner, and they remain unidentified to this day.

35.    When Richard McClanahan came out of surgery he allegedly mentioned a Richard, not Richard Horton. He did not have a last name.

36. Rhonda Curry told the detective the Petitioner's full name at the end of October. Richard McClanahan's niece had gotten the Petitioner's last name from a high school yearbook.

37. Detective Walker put together a photo array. She did not show it to either Rhonda Curry or Richard McClanahan until December, two months after the incident occurred, and after Richard Horton's photograph had been looked up in a yearbook.

38. Richard McClanahan identified Petitioner from a photo array. Petitioner was the only light-skinned individual in the array. Richard McClanahan testified that he was drug, beat, and shot; therefore he should be able to identify his attacker.

39. Rhonda Curry identified Petitioner from the same flawed array. Rhonda Curry later testified that she never saw the attacker's face completely. She identified Petitioner by his eyes, calling them evil.

40. Petitioner discovered that he had a warrant out for his arrest. He then voluntarily turned himself to the Franklin County Jail on December 27, 2004 in order to clear matters up.

## V. Grounds for Relief

### Ground One:

PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTIUTION. PETITIONER'S COUNSEL'S PERFORMANCE FELL BELOW OBJECTIVE STANDARDS OF PROFESSIONAL COMPETENCE AND THE RESULTING PREJUDICE RENDERED THE TRIAL CONSTITUTIONALLY INFIRM WHEN COUNSEL FAILED TO HIRE AN EXPERT, PRODUCE A REPORT, AND PROVIDE EXCULPATORY TESTIMONY FROM SAID EXPERT TO THE JURY IN THIS MATTER.

41. A petitioner must show that counsel's performance was deficient, which requires a showing that counsel made errors so serious that counsel was not functioning as

the "counsel" guaranteed defendant by the Sixth Amendment. *Strickland V. Washington,* 466 U.S. 688, in the syllabus.

42. To establish prejudice, the Petitioner must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

43. Attorney William Lazarow reviewed the state court record in this matter and signed an affidavit in regards to the so-called *Strickland* test.

44. Attorney Lazarow determined that trial counsel should have obtained an expert on eyewitness identification. *See, Dr. Leippe's ten page report.* This expert could have explained to the jurors that:

    a.     Both Curry and McClanahan may have experienced an unconscious transference of memory. McClanahan may have mistaken the actual culprit for the Petitioner during the phone booth incident and Curry may have mistaken the intruder for the Petitioner.

    b.     The lineup was highly suggestive and undermined credibility in its result

    c.     Eyewitness confidence is a terrible indicator of accuracy.

45. By failing to hire said expert counsel for the petitioner fell below objective professional standards thus rendering his assistance ineffective.

46. Counsel during the post conviction collateral civil attack on the conviction hired Doctor John Tilley and Doctor Leippe to evaluate the identification made by both Rhonda Curry and Richard McClanahan. Only Doctor Tilley testified at the evidentiary hearing in this matter.

47. Doctor Tilley testified that "eyewitness testimony is fallible even under the most optimum conditions." *T.P. 58, line 24-25.*

48. In regards to eyewitness confidence he states, "an individual making a misidentification is just as confident in their choice as a person making a correct identification." *Id. at page 60, line 5-7.* This is a phenomenon known as confidence inflation. A witness inflating their observation to appear absolutely sure that this was the person who criminally violated them. There is absolutely no correlation between confidence and accuracy according to Doctor Tilley. He testified that confidence inflation occurred in this case in both identifications.

49. Doctor Tilley also testified as to a phenomenon known as memory transference. He then testified regarding the factors that lead to memory transference:

     a. High degree of stress involved with the crime;

     b. Crime was relatively brief;

     c. Lack of a vantage point to view crime;

     d. Moderate or minimal familiarity with the individual.

50. Doctor Tilley also talked about the effect that being shot and being struck on the head has on a person's memory. That is, when someone is injured (shot) there are neurotransmitters that are released into the memory cortex. These factors inhibit the consolidation of memory.

51. Doctor Tilley further testified regarding the use of a simultaneous as opposed to a sequential lineup. When a person is shown a group of pictures sequentially it reduces the error rate to twenty percent. When a person is shown a group of pictures simultaneously the error rate is forty percent.

52. Richard McClanahan was struck over the head and shot. The resulting increased adrenaline would minimize the accuracy of the identification.

53. Doctor Leippe states that Richard McClanahan may have mistaken the person at the phone booth for Petitioner. He states that, "given sufficient resemblance, it would not be unusual for a witness to confuse a person with someone else who the witness has seen only infrequently, possibly not for years, and never more than in passing." The doctor further states, "Research on facial recognition suggests that the likelihood of mistaken recognition is heightened further by the facts that the encounter at the phone booth was brief and the witness was preoccupied with other tasks, and by the fact that the encounter occurred in the same context in which the witness has seen [Petitioner] every time in the past. If this is so McClanahan may have correctly recognized the robbery perpetrator as the person from the phone booth incident but the perpetrator was not [Petitioner]. "

54. In regards to witness Curry, Doctor Leippe states that the identification may be the result of memory transference. This involves the process of transferring the face of someone who is slightly familiar with something that is unfamiliar. In this case Rhonda Curry had stated she had seen Petitioner around town. However, she did not know him that well. When she saw the robbers face she transferred the memory of Petitioner's face to the robbers.

55. Doctor Leippe said that the conditions to view the robbers face were exceedingly poor. He had a hood tied around his face, while pointing a gun, and moving quickly. Richard McClanahan stated, "He had a hood drawn all the way up. You

could see this much around his eyes actually." *T.P. 69 at lines 23-25; T.P. 70, at lines 1-6.* McClanahan further states, "All I told the Detective was what I saw with the hooded drawed all the way up." *T.P. 76, at lines 15-17.*

56. Doctor Leippe further noted that the identification was hindered by weapons focus. Memory accuracy may decline when fear, stress, and violence were high during witnessing. As Doctor Leippe notes, "the mind and the body in such a state are geared to fight and/or flee, not to the work of witnessing a face." Weapons focus diminishes the accuracy of the identification for two reasons

   1. The presence of a weapon adds to a level of fear that hinders the memory;

   2. The person focuses on the gun, not the face.

57. Doctor Leippe also discussed the problem of witness confidence. He states that, "confidence in memory is not commonly correlated with memory accuracy."

58. Doctor Leippe also states that the length of time between the event and the lineup is significant. He states that memory tends to depreciate within a week or two. This is crucial because the lineup did not occur for *months* after the event.

59. Both Doctor Leippe and Tilley agree this identification is suspect and suffers from serious deficiencies. They both would testify to the same in a trial of the Petitioner had they been called by counsel.

60. Further, Petitioner was the only light-skinned African American in the photo array. *T.P. 77, lines 17-22; T.P. 102, lines 1-10.* The trial court made this finding of fact during the trial of this case in state court, stating, "without question Richard Horton is the lightest." *T.P. 32, at lines 17-25.*

61. Under AEDPA, we review "the last reasoned state-court decision on the issue to determine whether that decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts.'" *Ruhlman v. Brunsman,* 664 F.3d 615, 619 (6th Cir.2011) (quoting 28 U.S.C. § 2254(d)). "A state court's determination is contrary to clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Id.* (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)). "A state-court decision is an unreasonable application of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams,* 529 U.S. at 413). Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," *Williams,* 529 U.S. at 410, such that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011). This "highly deferential standard" requires that determinations made in state court "be given the benefit of the doubt." *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011) (internal quotations marks omitted).

-17-

62. The state court makes numerous unreasonable applications of *Strickland v. Washington* and its progeny to the facts in this case.

63. The state court found, "The trial court did not err in concluding counsel's failure to call an expert to testify regarding eyewitness identification was a tactical decision that did not fall below an objective level of reasonable representation." In regards to the objective portion of Strickland the court found, "Defendant nonetheless claims his attorney's decision not to call an expert witness was not trial strategy, because counsel did not discuss with him the possibility of retaining an expert to testify about eyewitness identification issues. (Aug. 27, 2008 Tr. 97.) Defendant, however, points to no authority indicating an attorney's failure to discuss with his or her client whether to call an expert witness removes the decision from the ambit of trial strategy. Cf. Prof.Con.R. 1.4(a)(2) (stating that in communication between a lawyer and client, the lawyer should "*reasonably* consult with the client about the means by which the client's objectives are to be accomplished"). Whatever the ethical considerations may be if counsel did not discuss the matter with defendant, the decision, in the circumstances of this case, remains one of trial strategy." This completely ignores the affidavit from William Lazarow. Mr. Lazarow describes in intricate detail what was necessary to provide effective assistance. This includes hiring an expert to assist the jury in understanding the vagaries of eyewitness identification. Why the state court focused this on testimony and not the affidavit of William Lazarow is puzzling.

64. The state court found in regards to the memory transference:

The third point of Dr. Tilley's testimony addressed memory transference, which occurs where "an individual believes they're recalling someone from a particular

-18-

situation, when in essence they are actually recalling them from a different situation." (Tr. 63.) According to Dr. Tilley, the individual's memory confuses the two events because they are similar in nature. Dr. Tilley stated factors influencing memory transference include a "high degree of stress" that occurred with respect to the event. (Tr. 64.) He also included factors such as whether "the crime or situation occurred briefly, if there was relatively little time, or a good viewpoint from which to make an identification, and also that there be some moderate to minimal familiarity with the individual." (Tr. 64.) Although Dr. Tilley testified being shot would be the high stress type of situation that would lead to memory transference, he also admitted some studies indicated a high degree of stress actually increases the likelihood a witness will correctly identify a suspect. The doctor also admitted that the longer a person spends with the suspect, the more likely the identification will be good. (Tr. 87.) Here, the robbery lasted between 15 and 25 minutes, so it was not a brief encounter that would increase the likeliness of memory transference. (Tr. 99.) Dr. Tilley also agreed the closer the witness was to the perpetrator and the greater the lighting in the area, the more likely the witness made an accurate identification. (Tr. 88.) Here, the robbery occurred in the morning, and the two victims and the robber were all confined to the front room of the house, leaving little distance between the victims and the perpetrator. (Tr. 46, 50.)

It is unbelievable that this incident would have taken a half an hour. It just cannot be believed. The accusation is that the perpetrator knocked on the door, kicked the door in, shot McClanahan, rummaged through the house and then ran off. It is unreasonable to believe this took twenty five minutes. Rhonda Curry's sister was in the back room and she did not call the police. No one else in the area called the police. A man is ransacking the room for twenty five minutes and no one called police. Such a ridiculous story is not entitled to deference. This series of events cannot possibly take twenty-five minutes.

65. The state court assumes, unreasonably, that the person encountered at the pay phone is the same person who robbed McClanahan and Curry. They state:

In the final analysis, mistaken identity was highly unlikely because the victims and defendant knew each other. See *State v. Crosby*, 186 Ohio App.3d 453, 928 N.E.2d 795, 2010–Ohio–1584, ¶ 2–3, 30, 41, appeal not allowed, 126 Ohio St.3d 1549, 2010–Ohio–3855 (noting expert testimony on eyewitness identification may have confused the jury where mistaken identity was unlikely because the

victim and defendant knew each other and, when the victim came out of a coma, he immediately identified the defendant as the gunman). Dr. Tilley admitted a witness will more easily identify someone he or she knows than a stranger, and the longer the witness has known someone, the more easily he or she will identify them. (Tr. 91–92.) The victims here met defendant several years before the incident, and both testified they were familiar with defendant from seeing him around the neighborhood. (Tr. 55, 73, 99, 100–01.) Indeed, defendant testified he would readily recognize McClanahan or Curry, suggesting the reverse also would be true. The testimony supports that conclusion, as Curry and McClanahan arrived at the determination that defendant was the perpetrator independent from one another. Finally, other factors beyond eyewitness identification connected defendant to the crime. McClanahan testified that during the robbery the perpetrator said, "You just got paid yesterday. Get that god damn money." McClanahan told him he did not have the money, and the intruder retorted, "You got [sic] damn lie, you know where that money at. * * * Where is your telephone now, huh? Where is your telephone at?" (Tr. 49.) The perpetrator thus referred during the robbery to the previous day's comments about McClanahan's money and the pay phone, and he even used some of the same words the men exchanged the prior day. McClanahan also testified that, apart from physical features, he was able to identify defendant on the sound of his voice, which he recognized from the previous day's encounter with defendant. (Tr. 59, 70.) McClanahan further noted the perpetrator wore the same clothes defendant wore the day before at the phone booth. (Tr. 57.) As a result, the robber's voice, clothes, and words, compared to defendant's voice, clothes, and words from the day before at the phone booth, demonstrate that even if defense counsel called an expert witness to testify on eyewitness identification, the jury's verdict would have been the same. The trial court did not err in determining defendant suffered no prejudice from his attorney's decision not to call an expert to testify to eyewitness identification.

The Tenth Districts discounts the fact that Doctor Leippe talks about this in his

report. He states:

McClanahan claims the perpetrator was the same person he briefly encountered the previous evening at a phone booth and that this person was Horton. There is a very real possibility, however, that the person at the phone booth was not Horton, but closely resembled Horton and was mistaken for him. Given sufficient resemblance, it would not be unusual for a witness to confuse a person with someone else who the witness has seen only infrequently, possibly not for years, and never more than in passing. Research on facial recognition suggests that the likelihood of mistaken recognition is heightened further by the facts that the encounter at the phone booth was brief and the witness was preoccupied with other tasks and by the fact that the encounter occurred in the same context in which the witness had seen Horton every time in the past. If this is so McClanahan may have correctly recognized the robbery perpetrator as the person from the phone booth incident but the perpetrator was not Horton.

This report was attached to the amended petition and part of the record. It is

unreasonable for the state court to ignore this piece of information from Doctor

Leippe. If McClanahan mistakenly identified the person at the phone booth as

Petitioner then what the robber said to McClanahan doesn't matter. Because it

isn't the Petitioner, either at the phone booth or in McClanahan's home. What

makes this convenient omission important is the fact the state court omitted this

fact in the subjective portion of the *Strickland* analysis. Certainly, if you omit

important parts of the reports from the two doctors who analyzed this case, then

you can reach the conclusion that there was no prejudice.

66. The state court found in regard to eyewitness confidence:

Dr. Tilley stated "witnesses tend to be overly confident in their reports," so "[a]n
individual making a misidentification is just as confident in their choice as a
person making a correct identification." (Tr. 59–60.) The witness opined
"confidence inflation" occurred here, noting McClanahan initially could
remember only defendant's first name, but later said he was 100 percent certain of
the suspect's identity. (Tr. 61.) Apart from whether Dr. Tilley's specific testimony
regarding McClanahan would have been admissible, the trial court pointed out the
flaw in the witness' logic because McClanahan, while at the hospital, identified
the man who shot him as "Richard," the person to whom his niece had sold a car
several years back. McClanahan offered he could retrieve the last name for the
detective once he was out of the hospital. (Tr. 83–84.) As the trial court observed,
the witness obviously knew the man he was trying to identify, and McClanahan's
inability to remember the last name was a "ludicrous" basis on which to say
McClanahan initially was not confident in identifying defendant. (Tr. 84.)

This misses the point completely. Doctor Leippe addresses this very issue in his

report, which again, the state court completely ignored. He found that, "Witness

confidence is an especially weak gauge of witness accuracy as time passes

following the criminal incident." Also, "Confidence of an eyewitness in his

memory commonly has very little relationship to the accuracy of the eyewitness."

-21-

McClanahan did not "remember" Petitioner until after he came out of surgery. He was not presented with the faulty lineup sheet until two months after the incident. To find this identification was not faulty ignores all of the scientific evidence presented to the state court.

67. The state court's determination is unreasonable.

68. Detective Walker testified that she was provided Richard Horton's name. She took that name and found him in the police computer system. She used the photo in the computer system to develop a photo array. Detective Walker placed characteristics in the computer and came up with photo array. It was then showed to Richard McClanahan and Rhonda Curry. They both picked Petitioner.

69. Petitioner filed a motion to suppress arguing that this lineup was unduly suggestive. This was over ruled by the trial court. This was all he did. Counsel for petitioner did not, however, object when this photo array was introduced. Counsel for the petitioner did not object when the photo array was moved to be admitted at the close of the state's case. Counsel for the Petitioner did not object to testimony regarding this photographic array. He did not object to Detective Walker's discussion of this unduly suggestive photo array Counsel for the Petitioner did not object to testimony from Richard McClanahan regarding this identification. Counsel for the Petitioner did not object to testimony from Rhonda Curry regarding this identification.

70. This identification, besides being suggestible, was not reliable. The two witnesses never testified that they saw the robber's face.

**Ground Two:**

> PETITIONER'S TWENTY-TWO YEAR SENTENCE VIOLATES HIS SIXTH
> AMENDMENT RIGHT TO HAVE THE JURY DECIDE ALL ISSUES OF
> FACT PURSUANT TO THE SUPREME COURT OF THE UNITED STATES
> HOLDING IN BLAKELY V. WASHINGTON AND APPRENDI V. NEW
> JERSEY

71.     Petitioner was convicted of aggravated burglary, two counts of aggravated

robbery, felonious assault, and having a weapon under disability.

72.     Aggravated burglary carries a minimum of three years' incarceration. Aggravated

robbery carries a minimum of three years. Felonious assault carries a two year

minimum. Having a weapon under disability carries a minimum of one year.

73.     At the sentencing in this matter the trial court commented, "To me this is among

the most serious of offenses. Given your past record and given the viciousness of

theses offenses, I have no alternative, in my mind, and would not be doing my job

unless I passed a severe sentence in this case." *Sentencing hearing, T.P. 19 at*

*lines 7-12.*

74.     The trial court commented on Petitioner's past criminal record and the

viciousness of the crime to increase his sentence. These are facts not found by the

jury, thereby violating the Blakely, Apprendi line of cases.

75.     The Sixth Circuit has found, "under Ohio Rev. Code Ann § 2929.14 (B), absent a

prior conviction, or additional judicial fact finding, a judge was required to

impose the shortest term authorized by the statute. Blakely's rule was clear that

the statutory maximum for Apprendi purposes was the maximum that could be

imposed solely on the basis of the facts reflected in the jury verdict or admitted by

a defendant. In the inmate's case, the maximum was 9 years. Because the inmate

was sentenced to 13 years based on additional judicially found facts, the sentence was contrary to, and an unreasonable application of clearly established federal law." *Smith v. Moore*, 415 Fed. Appx. 624, 2011 WL 338443.

76.     The judge has found an additional fact, not found by the juror - the prior conviction of the Petitioner. He further found that this offense was vicious. These are two additional facts not found by the jury but which the judge used in sentencing Petitioner.

### Ground Three:

THE UNDULY SUGGESTIVE LINEUP LACKS RELIABILITY AND VIOLATES PETITONER'S RIGHTS UNDER THE FEDERAL CONSTITUTION

77.     The Sixth Circuit has stated, "A conviction based on identification testimony that follows a pretrial identification violates the defendants constitutional right to due process whenever the pretrial identification is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Leadbetter v. Edwards 35 F. 3d 1062, 1070.* A court must undertake a two step analysis to determine the validity of a pretrial identification. First the court must determine if it was unduly suggestive. If the court finds that the procedure was unduly suggestive, the court must then, "evaluate the totality of the circumstances to determine whether the identification was nevertheless reliable." *Id.* Petitioner bears the burden of showing impermissible suggestiveness.

78.     A court must evaluate the totality of the circumstances to assess the reliability of a witness identification, including the following factors, "...the opportunity of the witness to view the criminal at the time of the crime, the witness degree of

attention, the accuracy of the witness prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between crime and confrontation." *Id.* The ultimate question is whether, "under all the circumstances of the case there is a very substantial likelihood of irreparable misidentification." *Mason v. Braithwaite 432 U.S. 98.*

79. As the United States  Supreme Court made clear in *Perry v. New Hampshire 132 S. Ct. 716*, what triggers due process concerns about eyewitness identification testimony is police use of an unnecessarily suggestive identification procedure.

80. It appears that the victims Richard McClanahan and Rhonda Curry apparently misidentified Petitioner as the suspect who committed the crime.  Both Curry and McClanahan never saw the robber's face, only his eyes.  The robbers face was entirely covered making it impossible for the victims to identify anyone. Additionally, when Detective Walker interviewed Curry the morning of the attack, she did not mention the Petitioner at all.  Curry did not describe any facial features on the suspect or how this perpetrator favored the Petitioner.

81. McClanahan and Curry only had an idea of who robbed them, not an identification of the robber.  This idea was based upon the words the suspect said, his demeanor, and the clothing the perpetrator wore.

82. The Supreme Court of the United States stated, "The chance of misidentification by an eyewitness is increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or *if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification

is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, *the witness thereafter is apt to remain in his memory the image of the photograph rather than of the person actually seen,* reducing the trustworthiness of subsequent lineup or courtroom identification." (emphasis added) *Simmons v. the United States, 390 U.S. 377*

83. McClanahan and Curry both testified that the photo array was emphasized to the point where Petitioner was the only light-skinned African American in the photo array. *T.P 77 at lines 17-22, T.P 102 at lines 1-10.* Additionally, the trial court made the specific finding that, "without question Richard Horton is the lightest." *T.P. 32 at lines 17-25.* Petitioner may have looked like the robber whom McClanahan and Curry suspect but in actuality this robber was not him.

84. Doctor Leippe [1] testified at the evidentiary hearing that the conditions to view the robber's face were exceedingly poor. The robber had a hood tied around his face, while pointing a gun, and moving quickly. Memory accuracy may also decline when fear, stress, and violence were high during the witnessing of the event.

85. He further testified that the identification was hindered by weapons focus. This refers to the witness' attention on the weapon leaving less attention for other

---

[1] Doctor Leippe has a PHD in Psychology with a specialization of social psychology from the Ohio State University. He has over 35 years being a professor at St. Norbert College, Adelphi University, and Saint Louis University. His areas of research include eyewitness memory and behavior, as well as jury reactions to witness evidence, expert testimony, and other factors. He has approximately 40 publications in peer review journals and edited volumes, with over half in the area of law. Dr. Leippe has served ten years on the editorial boards of major journals that publish research on eyewitness behavior. He has also taught undergraduate and graduate courses focused on social cognition, social influence and memory in criminal justice settings, eyewitness testimony, jury decision-making, and other aspects of psychology and law. Dr. Leippe has served as one of a small group of experts asked to review and provide input regarding proposed national guidelines for law enforcement officers published by the Department of Justice and entitled as "Eyewitness Evidence: A guide for law enforcement." In short, Dr. Leippe has been qualified as an eyewitness expert in numerous courts around the country. He has consulted about adult and child eyewitness testimony in over 40 criminal cases and given expert testimony in more than 15 jury trials.

details of the crime. (Loftus, Loftus, & Messo, 1987; Mass & Kohnken 1989; Mitchell, Livosky & Mather, 1998; Pickel, 1998; and Steblay 1992) The weapon is an object that, "appears to capture a good deal of attention resulting in, among other things, a reduced ability to recall other details from the environment" (Loftus, 1979, p. 35). Curry testified that her focus was on the weapon, not the robber. *T.P. 82-86* McClanahan's identification was also hindered by weapons focus. *T.P. 48-50*

86. Doctor Leippe also states there is yet another relevant factor in evaluating this case. McClanahan is quoted as saying, "voice, same eyebrows, wearing the same pants as the night before, 100 % certain." Doctor Leippe states, "Horton's pants are not even shown in the picture and the lineup procedure does not include any voice sample."

87. Both McClanahan and Curry's descriptions of Petitioner are of the person they knew from the neighborhood. Although they claimed that these descriptions were accurate, they certainly lent nothing to the reliability of the identifications. Doctor Leippe states that McClanahan clearly had already decided Petitioner was the guy and did not even look at the picture. His response was a scripted summary of his prior conviction. The state court of appeals decision is not entitled to deference. The court of appeals decision is unreasonable. Therefore, this Court should grant habeas relief.

## VI. Exhaustion

88. As a general rule, state prisoners must first exhaust their available state court remedies before seeking federal habeas corpus relief by fairly presenting all their

grounds for relief to the state courts. 28 U.S.C. § 2254(b)-(c); *Clemmons v. Sowders,* 34 F.3d 352, 354 (6th Cir.1994). Normally, the exhaustion requirement is satisfied after the petitioner fairly presents all his issues to the highest court in the state in which the petitioner was convicted, thus giving the state a full and fair opportunity to rule on them before seeking relief in federal court. *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994). All grounds for relief raised in this petition for a writ of habeas corpus have previously been presented to the Ohio state courts. There was a discretionary appeal to the Ohio Supreme Court on direct appeal. All issues raised in this petition were presented to the state courts for review.

## VII.     AEDPA One Year Statute of Limitations

89.     Pursuant to AEDPA, a state prisoner claiming imprisonment in violation of the laws or Constitution of the United States has one year from the completion of direct review of his case to file for federal habeas relief. *See <u>28 U.S.C. § 2244(d) (1)</u>*. The time period in which the defendant seeks state post conviction review of his conviction tolls the statute of limitations for purposes of AEDPA. <u>28 U.S.C. § 2244(d)(2).</u>The one-year statute of limitations begins to run on a habeas petition that challenges a resentencing judgment on the date that the resentencing judgment became final, rather than the date that the original conviction became final. *Linscott v. Rose, 436 F 3d 587.* The time allowed for filing a petition of certiorari in the United States Supreme Court, whether petition is filed or not, tolls the time for filing a petition under AEDPA. *Abela v. Martin, 348 F. 3d 164.* This petition has been brought within the one-year statute of limitations as required by AEDPA.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for this Court to:

1.  Issue a writ of habeas corpus to have Petitioner brought before the court to the end that he may be discharged from his unconstitutional conviction;

2.  Require Respondent to bring forward the entire record of the state court proceedings, and to specify any proceeding in the case that has been reported but not transcribed;

3.  Require Respondent to file an answer admitting or denying each and every factual allegation herein;

4.  Allow Petitioner to conduct discovery and to expand the record relating to the issues raised by this petition;

5.  Conduct a hearing at which proof may be offered concerning the allegations in this petition that Respondent does not admit;

6.  Allow Petitioner sufficient time to brief the issues of law raised by this petition; and

7.  Grant such other and further relief as may be appropriate

                            Respectfully submitted,



                            _____
                            ERIC J. ALLEN            (0073384)
                            The Law Office of Eric J Allen, LTD
                            713 South Front Street
                            Columbus, Ohio 43206
                            Phone: 614-443-4840
                            Fax: 614-445-7873
                            Email: eric@eallenlaw.com